THE NATIONAL LIFE & ACCIDENT INSURANCE CO. v. F. K. HUNTER.

Eastern Section. September 12, 1931.

Petition for Certiorari denied by Supreme Court, January 1, 1932.

Kennerly & Key, of Knoxville, for plaintiff in error.
Ray H. Jenkins, of Knoxville, for defendants in error.

PORTRUM, J.  The plaintiff, Hunter, recovered a judgment of $160 for the accidental loss of an eye, against the Insurance Company on an Industrial Health and Accident Policy, for which he paid the monthly premium of $2.80.  The company defends upon the ground that at the date of the accident the policy had lapsed, and that this particular accident was not covered by the terms of the policy.  The policy contains this notice:

"Premiums are due on the first day of each month, in advance, and must be so paid either at the home office of the company or to such person as may be designated by the company in writing to receive them. . . ."

And in case of default by nonpayment of the premiums on the date due, the policy contains this provision for reinstatement:

"If default be made in the payment of the agreed premium upon this policy, the acceptance of a premium by the company or by any of its duly authorized agents shall reinstate the policy, but only to cover accidental injury thereafter sustained and such sickness as may begin more than ten days after the date of such acceptance."

And another provision provides:

"No agent has authority to change this policy or to waive any of its provisions.  No change in this policy shall be valid unless approved by an executive officer of the company, and such approval be endorsed thereon."

The accidental injury sued for was inflicted on July 7, 1930; and the insured's premium receipt book carries this notation of the payment of the premium for July: "1930, July, 9th, July $2.80, C. O. B." These entries are made in parallel, the first three are headed "Actual Date Paid," the next "Month Paid For," the next "Total Amount Paid," and the last "Received by (Collector's signature)." Therefore, it is insisted by the company, that the proof shows the premium for July was paid on the 9th of the month, when the accident happened on the 7th, and the accidental injury was not covered by the policy which was in default. The insured relies upon an express, or an implied waiver of the default provision of the contract. The company says that its agent had no authority to waive this provision of the insurance contract. This policy was delivered and the premium paid on October 1, 1929, and the November payment was paid on October 30th, and the December payment on November 30th, but the January payment was not paid until January 11th, and the February payment February 5th, the March payment March 5th, the April payment April 2nd, the May payment May 7th, the June payment June 6th, and the July payment July 9th. The company sent its collector to the home of the insured for the receipt of payments on these respective dates, and upon the receipt of the payments the collector signed the receipt book. It happened that the collector called on July 2nd, but the insured's wife who paid the premiums because of the absence of her husband, who worked away from home, did not have the money on that date to pay it, so the agent called again on the 9th and received the payment. There were ten payments made on this policy; the first payment on the date the policy was taken out, and the next two on the day before the premium was due, all the rest were called for and paid on a later date than the due date. So according to the insistence of the company this policy should lapse each month beginning January, 1930, and notwithstanding the premiums for the whole term of seven months were collected, the insured was not insured against accident for forty-four days during this period, and in case of sickness ten days for each month was to be added, making a total of seventy days, and adding the seventy to forty-four, we have one hundred and fourteen days, in a period of two hundred and twelve days, that the company offered no protection, notwithstanding it had received a premium covering this period, and had represented upon the receipt book that the amount received covered the particular month paid for, which was named. If we hold that the conduct of the company and its collector, in making these delayed calls for premiums, did not amount to a waiver of the default provision, then it would be to the material interest of the company to have its agents call a day or two late

for the premiums. And it is to be inferred this company had several policies in force, and also it was the duty of the agent or collector to collect from a large number of policy holders; these policies fell due on the first day of the month, because it is printed in the policy the date due; it is not possible that the agent or collector could call upon all the policy holders on the first day of the month and make collections and avoid default. The company knew this, and if it did not expressly direct its collectors to call after the due date and make the collections, it necessarily acquiesced in this practice. There is no other reasonable inference. The company introduced no witness in this case to show that this custom of its collector was unauthorized. To permit the company to represent to the insured that the receipt of premiums paid upon the 11th or 7th of the month represented the "Month paid for" and then escape in the first instance by denying liability for sick benefit for twenty-one days, or for accidental injury for eleven days, would be no less than permitting the company to set a pitfall for its policy holders.

"We see no hardship to the insurer in this view of the matter. It is surely not admissible to suppose that any insurance company is very alert for occasions to declare forfeiture and thereby to keep moneys for which no equivalent has been rendered. The company is entitled to prompt payment of premiums. It is only by such payments that its business can be carried on. The power to declare forfeitures for nonpayment is given to effectuate this purpose. But it is a perversion of the purpose when forfeitures are in themselves made an object or end to be attained. Therefore the courts have always seized upon every reasonable circumstance presented in a case to prevent the taking effect of a forfeiture." Kavanaugh v. Insurance Co., 117 Tenn., 54.

We pass now to the second defense. Was the accidental injury covered by the policy? A provision of the policy provides:

"Section C: This policy does not cover: (5) Injury, fatal or nonfatal, intentionally inflicted upon the insured by himself or by any other person, except by burglars or robbers."

The only testimony in reference to the injury was given by the insured as follows:

"Gentlemen of the jury, how I got my eye knocked out, I was working in the plant cotting and at the time when I got my eye knocked out I had gone to a fellow for a chew of tobacco, and there was another fellow standing there and when I left there why he threw a broom up and the broom hit the ventilator and he hollered and told me that I had better look out, and the broom glanced and hit me in the eye.

"Q. The broom fell and hit the ventilator? A. Yes.

516

"Q. Did you see him throw the broom up and your back to him? A. Well, he would had to just flip it to hit the ventilator.

"Q. Now he threw the broom up towards the ceiling, up high? A. Well, he would not have to throw it so high. The ventilator was up over my head.

"Q. Was it up higher than your head? A. Yes.

"Q. The broom had to hit the ventilator before it hit you? A. Yes.

"Q. And bounced back off the ventilator and hit you? A. Yes."

Counsel for defendant asked the witness if he was tussling with the fellow that threw the broom, and the witness denied this, and he asked the witness if the follow was pitching the broom to see him jump, and he said he did not know what he was pitching it for. The witness had had no trouble with the man who pitched the broom, and neither was mad with the other; the witness had had no conversation with him for he was not the man from whom he had obtained the tobacco.

Counsel for the company says that the broom was thrown as a matter of horse-play, but that he threw the broom intentionally and is responsible for its natural consequences. For this reason the accidental injury was intentionally inflicted, and is not covered by the provision of the policy. There is no proof in this record that this man threw this broom at or towards the insured intentionally; for all the court knows, he may have been humoring his musical tendency, and may have been imitating the bandmaster of a high school band, and while juggling the stick it may have slipped from his hand, striking the ventilator and rebounding on the insured. Where the act is consistently innocent or wrongful, then in the absence of proof, the presumption is that the act was an innocent act. The burden of proof rests upon the company to make out the exception of non-liability, by showing the man intentionally threw the stick. These two legal propositions are supported by the authority of Freeze v. Continental Casualty Co., 5 Tenn., 271, and the numerous authorities therein reviewed and cited.

Another proposition of law, quoted from another case, in the Freeze case follows: "To bring injury to insured within exception of injuries from intentional act of another, the intention must be to commit injury, as well as to do the act, and must be toward the insured."

In the instant case the court must infer an intent to do the act, and it is conceded there was no intent or purpose to commit the injury.

Neither of the defenses are established; the judgment of the lower court is affirmed with costs.

Snodgrass and Thompson, JJ., concur.